## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

CARLOS PURIFOY,

     Plaintiff,

v.                                                    Case No.  3:20-cv-5394-LC-MJF

COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,[1]

     Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Carlos Purifoy brings this action under 42 U.S.C. § 405(g) seeking review of a final adverse decision of the Commissioner of the Social Security Administration. The Commissioner applied the proper standards, and the Commissioner's findings of fact and determinations are supported by substantial evidence. The undersigned, therefore, respectfully recommends that the decision of the Commissioner be affirmed.[2]

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Fed. R. Civ. P. 25(d), she is therefore automatically substituted for Andrew Saul as the Defendant in this case.

[2] The District Court referred this case to the undersigned pursuant to 28 U.S.C. § 636(b) and Local Rules 71.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq*.

# I. PROCEDURAL HISTORY

On March 22, 2017, Plaintiff filed an application for Disability Insurance Benefits ("DIB"). (Tr. 76).[3] Plaintiff alleged that he became disabled on July 8, 2013. (Tr. 159).[4] The Commissioner denied Plaintiff's claims initially and on reconsideration. (Tr. 95-105). On February 26, 2019, Plaintiff—represented by counsel—appeared and testified at a hearing before an Administrative Law Judge ("ALJ"). (Tr. 39-64). On April 2, 2019, the ALJ issued a written decision in which he found Plaintiff to be not disabled. (Tr. 9-26). The Appeals Council denied Plaintiff's request for review. (Tr. 1-4). Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court. *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1262 (11th Cir. 2007). This appeal followed.

---

[3] All references to "Tr." refer to the transcript of the SSA record filed on October 19, 2020. The page numbers cited herein are those found on the bottom right corner of each page of the transcript rather than the page numbers which were assigned by the court's electronic docketing system.

[4] Plaintiff alleged disability beginning July 8, 2013, but as the ALJ noted, Plaintiff previously received an unfavorable hearing decision on October 26, 2015. (Tr. 12). Plaintiff did not request reopening, and the ALJ determined that the previous decision was administratively final and there was no cause to reopen the prior claim. (*Id.*). Therefore, the ALJ determined that October 28, 2015 through the date of the ALJ's decision was the only relevant period. (*Id.*).

## II.  FINDINGS OF THE ALJ

In denying Plaintiff's claims, the ALJ made the following findings relevant to the issues raised in this appeal:

(1) Plaintiff met the insured status requirements of the Act through December 31, 2018;

(2) Plaintiff had not engaged in substantial gainful activity during the period from his alleged onset date of July 8, 2013, through his date last insured on December 31, 2018;

(3) Plaintiff had the following severe impairments: degenerative disc disease, degenerative joint disease of the bilateral knees, and obesity;

(4) Plaintiff did not have an impairment or combination of impairments that met or medically-equaled the severity of one of the listed impairments;

(5) Plaintiff had the Residual Functional Capacity ("RFC") to perform light work with the following limitations:

    a)  he can climb ladders, ropes, and scaffolds on an occasional basis;

    b)  he can occasionally balance;

    c)  he can kneel, crouch, and crawl on a frequent basis; and

    d)  he can have less than concentrated exposure to workplace hazards like dangerous moving machinery and unprotected heights.

(6) Plaintiff was unable to perform any past relevant work;

(7) There were jobs that existed in significant numbers in the national economy that Plaintiff could have performed; and

(8) Plaintiff was "not under a disability . . . at any time from July 8, 2013, the alleged onset date, through December 31, 2018, the date last insured." (Tr. 19-26).

## III. STANDARD

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). The Commissioner's decision should not be disturbed if it is supported by substantial evidence *and* the Commissioner applied the proper legal standards. 42 U.S.C. § 405(g); *Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998); *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995). The threshold for evidentiary sufficiency in Social Security cases is not high. *Biestek v. Berryhill*, 587 U.S. __, 139 S. Ct. 1148, 1154 (2019). Substantial evidence is "more than a mere scintilla." *Id.* It is not a preponderance, and it requires only "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Id.*; *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. *Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986). The reviewing

court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability, the physical or mental impairment must be so severe that the claimant could not perform his previous work and could not, "considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g),[5] the Commissioner analyzes a disability claim in five steps:

1.    Is the individual currently engaged in substantial gainful activity?

2.    Does the individual have any severe impairments?

3.    Does the individual have any severe impairments or combination of impairments that meet or equal those listed in 20 C.F.R. Part 404?

---

[5] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or Supplemental Security Income ("SSI"), but separate, parallel statutes and regulations exist for DIB and SSI claims. *See* 20 C.F.R. §§ 404, 416. Therefore, citations of statutes or regulations found in quoted court decisions in this report and recommendation should be considered to refer to the appropriate parallel provision.

4.      Does the individual have the RFC to perform work despite limitations and are there any impairments which prevent past relevant work?

5.      Do the individual's impairments prevent other work?

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work. 20 C.F.R. § 404.1512; *see Goode v. Comm'r of Soc. Sec.*, 966 F.3d 1277, 1278 (11th Cir. 2020) ("A claimant bears the burden at the first four steps."). If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. *Goode*, 966 F.3d at 1278; *MacGregor v. Bowen*, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant then must prove that he cannot perform the work suggested by the Commissioner. *Goode*, 966 F.3d at 1279; *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).

### IV.    PLAINTIFF'S MEDICAL HISTORY AND HEARING TESTIMONY

### A.    <u>Relevant Medical History</u>

From 1997 to 2013, Plaintiff worked in the warehouse of the Overhead Door Company. He resigned due to issues with his back. (Tr. 19, 45). On July 8, 2013, Plaintiff underwent back surgery.[6] (Tr. 293). Plaintiff "eventually lost health

---

[6] This information is provided only for context. As previously noted, the ALJ did not consider the record prior to October 26, 2015. (Tr. 19).

insurance from his job, explaining a gap in treatment that ended in 2015 when he was able to get on his wife's insurance." (Tr. 19).

On October 26, 2015, Plaintiff saw Shelby Brinson, a physician assistant at the Pain Consultants of West Florida for pain management. (Tr. 413). Plaintiff's chief complaint was pain in his lower back. He rated his pain nine out of ten on the Visual Analogue Scale ("VAS") with ten being the worst. (Tr. 413). Plaintiff reported that he received approximately thirty percent pain relief from his medications. (Tr. 413). Plaintiff reported that due to the pain, he had difficulty falling and staying asleep and was unable to get back to sleep after waking up. (Tr. 413).

Plaintiff stated that his pain was relieved by "lying down, medications and heat" and the pain worsened when he was bending or when the weather changed. (Tr. 413). PA Brinson stated in her medical notes that "[c]onservative treatment modalities including medication management, injection therapy, physical therapy, chiropractic treatment and stimulation therapy are medically necessary to improve functionality and quality of life." (Tr. 413).

During this visit, Plaintiff exhibited reduced lumbar range of motion and lumbar spine tenderness with palpation.[7] (Tr. 414). However, Plaintiff's straight leg

---

[7] PA Brinson's physical exam regarding the lumbar region of Plaintiff's spine stated: "Flexion is decreased 20 degrees with pain. Extension is decreased, 10 degrees and with pain. Sidebend to the left is with pain. Rotation to the left is WNL and without pain. Rotation to the right is WNL and without pain." (Tr. 414).

raise testing was negative, and he exhibited normal lumbar, hip, and knee motor strength. (Tr. 415). His sensation was also within normal limits. (Tr. 415).

PA Brinson prescribed Plaintiff "Norco 10-325 mg tablet take 1 tablet oral four times a day, PRN (as needed) for 30 days" and "Neurontin 400 mg capsule take 1 oral three times a day for 30 days." (Tr. 416). These medical records also included "Lifestyle Recommendations" for Plaintiff that included "Exercise Recommendations: Abdominal strengthening exercises, Stretching, Walking and core strengthening and McKenzie exercises. Weight Control/Loss Recommendations: It is recommended that patient discuss their weight loss goals with their PCP or other trained professional." (Tr. 416).

On December 14, 2015, Plaintiff saw Diana Polizo, a physician assistant, at the Pain Consultants of West Florida for pain management. (Tr. 408). Plaintiff's chief complaint was pain in his lower back and left buttocks. (Tr. 408). He reported his pain at nine out of ten on the VAS scale and stated that he received approximately thirty percent relief from his current medications. (Tr. 408). Plaintiff stated that his pain was relieved by lying down, medications, and heat, but that the pain worsened with bending and weather changes. (Tr. 408). PA Polizo's physical exam indicated that Plaintiff still exhibited decreased range of motion and tenderness in the lumbar spine but that his gait was normal. (Tr. 410). PA Polizo prescribed Norco and Neurontin and recommended exercise and weight loss. (Tr. 411).

On January 7, 2016, Plaintiff saw Dr. John May, MD, his primary care physician, at Sacred Heart Medical Group. (Tr. 257). Plaintiff complained of "chronic, most days lower back pain." (Tr. 257). Plaintiff stated that his pain was rated as an eight out of ten and that aggravating factors included walking, sitting, and standing. (Tr. 258-59). Pain relief factors included medication. (Tr. 259). Dr. May diagnosed Plaintiff with "Anxiety, lumbar disk disease with radicular discomfort and history of fusion" and ordered an x-ray image of Plaintiff's lumbar spine. (Tr. 257). Dr. May recommended that Plaintiff bring his body mass index ("BMI") down to 26 and noted that Plaintiff had been counseled previously on diet and exercise. (Tr. 259, 257). Plaintiff's straight leg raises were negative and deep tendon reflexes were normal (Tr. 257).

An x-ray image of Plaintiff's back was taken that day, and the observation notes stated "Patient has had prior fusion of L4 through S1 with pedicle-screws and rods. Anatomic alignment and positioning is not significantly changed. No evidence of acute hardware failure identified. No acute compression deformities are identified. Sacroiliac joints are symmetric. As compared with the prior study, there has been no detrimental interval change." (Tr. 285).

Between January and March 2016, Plaintiff returned to the Pain Consultants of West Florida and was treated by PA Polizo and PA Brinson. (Tr. 403, 397, 391). Plaintiff complained of pain in his lower back and left buttocks and reported his pain

level as between seven and nine out of ten on the VAS scale. (Tr. 403, 397, 391). Plaintiff stated that "he has good days and bad days." (Tr. 391). Plaintiff reported that he received approximately twenty to thirty percent pain relief from his medication. (Tr. 403, 391). The physical exams indicated that Plaintiff still exhibited decreased range of motion and tenderness in the lumbar spine. (Tr. 405, 399). Plaintiff's gait was normal. (Tr. 399, 405).

The physician assistants noted that one of the "signs and symptoms associated with the pain" include Plaintiff utilizing a cane. (Tr. 391, 403, 397). The physician assistants also noted that Plaintiff's pain was worsened by bending and weather changes but that his pain was "relieved by lying down, medications and heat." (Tr. 391, 405). Plaintiff complained that his pain reduced his ability to bend over and reach overhead. (Tr. 397). Plaintiff believed that his pain was stable, and he noted that he continued to stretch daily. (Tr. 397).

The physician assistants noted that "Conservative treatment modalities including medication management, injection therapy, physical therapy, chiropractic treatment and stimulation therapy are medically necessary to improve functionality and quality of life." (Tr. 403, 397). The physician assistants also recommended that Plaintiff engage in exercise including abdominal strengthening exercises, stretching, walking, and core strengthening. (Tr. 406, 400).

On April 7, 2016, May 2, 2016, and June 1, 2016, Plaintiff returned to the Pain Consults of West Florida and complained of pain in his lower back. (Tr. 386, 381, 376). Plaintiff reported at each of these visits that his lower back pain was between six to eight out of ten on the VAS scale and that he received twenty to twenty-five percent pain relief from his medication. (Tr. 386, 381, 376). Plaintiff continued to utilize a cane. He also continued to suffer sleep disturbances due to pain. (Tr. 386, 381, 376). The physical examinations indicated that Plaintiff still exhibited decreased range of motion and tenderness in the lumbar spine. (Tr. 378, 382, 388). Plaintiff's pain was worsened by bending and weather changes but was relieved "by lying down, medications and heat." (Tr. 386, 381, 376).

On May 2, 2016, Plaintiff complained that his pain was constant and worsened when he stood or sat for any length of time. (Tr. 381). Dr. Concepcion noted: "Patient has been doing physician guided regular home exercises almost [o]n a daily basis for more than three months he stated and pain still persists." (Tr. 381). Dr. Concepcion noted conservative treatment was necessary to improve functionality and quality of life and recommended exercise and that Plaintiff discuss weight loss goals with his primary care physician. (Tr. 381, 384). Dr. Concepcion scheduled a "Left SI Injection" and a follow-up appointment. (Tr. 384).

On June 29, 2016, Dr. Concepcion performed a "therapeutic placement of left sacroiliac join injection." (Tr. 370). Dr. Concepcion noted that he performed the

procedure "for the purpose of reducing pain, increasing functionality, and improving quality of life." (Tr. 371). Dr. Concepcion noted that Plaintiff's "Clinical pattern and physical exam consistent with SI joint irritations, MRI results consistent with SI joint irritations, Patient has failed conservative treatment and significant long-term relief from the same procedure previously." (Tr. 371).

On July 25, 2016, Plaintiff returned to the Pain Consults of West Florida. (Tr. 365). Plaintiff complained of lower back pain and reported his pain at a six out of ten on the VAS scale and approximately fifty percent pain relief from his medication. (Tr. 365). Plaintiff reported "70% relief for 3 weeks and now the pain has returned to baseline." (Tr. 365). Plaintiff told Dr. Concepcion that his pain was significantly reduced for three weeks but the pain gradually returned and is now continuous. (Tr. 365). Plaintiff still exhibited decreased range of motion and tenderness in the lumbar area. (Tr. 367). Dr. Concepcion noted conservative treatment was necessary to improve functionality and quality of life and recommended exercise and that Plaintiff discuss weight loss goals with his primary care physician. (Tr. 365, 368).

In August and September 2016, Plaintiff saw his pain management providers at the Pain Consults of West Florida. (Tr. 360, 355). He reported pain as an eight out of ten on the VAS scale and "about 15-25% pain relief from his current medications." (Tr. 360, 355). Plaintiff still exhibited decreased range of motion and tenderness in the lumbar area. (Tr. 362, 357). The providers noted that Plaintiff

exhibited signs and symptoms associate with the pain including "using a cane and sleep disturbances." (Tr. 360, 355). The providers continued to recommend conservative treatment, exercise, and that Plaintiff discuss weight loss goals with his primary care physician. (Tr. 360, 363, 355, 358).

In October, November, and December of 2016, Plaintiff returned to the Pain Consults of West Florida and reported that his medication reduced his pain sixty-five to seventy percent. (Tr. 350, 345, 339). During each of these visits, the providers recommended exercise and weight loss. (Tr. 352, 348, 342). In October 2016, Dr. Conception stated that Plaintiff's functional limitations include "walking ability long distances, difficulty falling asleep, difficulty staying asleep, unable to get back to sleep after waking up, awakens too early, driving, sweeping, vacuuming, bending over, climbing stairs, stand up straight and walk normally." (Tr. 350). Plaintiff reported that the pain is "relieved by bed rest, medication, heat, ice, muscle relaxants, rest and lying down." (Tr. 350).

Plaintiff stated in November and December 2016 that his pain was increased by acts of "bending, prolonged sitting, prolonged standing, walking and overhead activity." (Tr. 339, 345). However, Plaintiff stated that his pain was "relieved by exercise, medications, heat and opioid analgesics." (Tr. 339, 345). Plaintiff opted to defer injections but was "considering a repeat caudal injection after the new year." (Tr. 339).

Because of his back pain, on June 3 and September 6, 2016, Plaintiff visited his primary care physician, Dr. May. (Tr. 296, 301). Plaintiff told Dr. May that "Cyclobenzaprine was not working well for his back muscle spasms." (Tr. 298). Dr. May noted that Plaintiff exhibited paralumbar muscle spasms. (Tr. 298). Plaintiff stated that his "muscles 'bunch up frequently.'" (Tr. 298).

On December 6, 2016, Plaintiff saw Dr. May. (Tr. 294-96, 480). He reported right knee pain and knee instability and Plaintiff was using a cane. (Tr. 296). Dr. May recorded that Plaintiff's knee was swollen and warm, and he exhibited pain with "flexion more than" 30 degrees "of the right knee." (Tr. 294, 296).

On December 27, 2016, Plaintiff again saw Dr. May and reported that he had continuing pain in his right knee, his knee felt unstable, he suffers from intermittent vertigo, and that he had fallen in his bathtub. (Tr. 478, 480). Dr. May recorded that Plaintiff's knee was "swollen mildly tender distal and lateral to the patella" and that Plaintiff had "pain with flexion more than" thirty degrees and "pain with weightbearing." (Tr. 480). Dr. May ordered magnetic resonance imaging ("MRI") of Plaintiff's right knee. (Tr. 480).

In January, February, and March 2017, Plaintiff saw PA Brinson at the Pain Consults of West Florida. (Tr. 617-26). Plaintiff reported that his medications handled sixty to seventy percent of his pain. (Tr. 626, 620). Plaintiff rated his pain as between seven and eight out of ten and noted that his pain was associated with

back stiffness and back spasms. (Tr. 626, 620). PA Brinson recorded that the "pain is aggravated by bending, prolonged sitting, prolonged standing, walking and overhead activity" but that the pain is relieved by "exercise, medication, heat and opioid analgesics." (Tr. 626). Plaintiff still exhibited decreased range of motion and tenderness in the lumbar area. (Tr. 628). Plaintiff reported that he has not been to physical therapy because he could not afford it. (Tr. 620). However, his gait and hip motor strength were normal (Tr. 621-22, 628). PA Brinson recommended that Plaintiff do abdominal strengthening exercises, walking, core strengthening, and stretching. (Tr. 629, 623).

On March 3, 2017, Plaintiff followed up with Dr. May. (Tr. 475). Dr. May informed Plaintiff that his insurance company denied "his MRI of the knee." (Tr. 477). Dr. May noted that Plaintiff "had lots of questions about 'disability' he is consistent for disability evaluations in the past." (Tr. 477, 291). Dr. May informed Plaintiff that "we are not greatly involved in disability evaluations or decisions." (Tr. 477). Dr. May recommended an orthopedic consultation and noted that Plaintiff still was using a cane. (Tr. 477).

On March 14, 2017, Plaintiff returned to Dr. Concepcion for an injection into his right knee. (Tr. 320). Dr. Concepcion noted in the "Indications for Procedure" that "Patient has failed conservative therapy, home exercise, OTC NSAIDS, full strength NSAIDS, physical therapy, X-rays of knees with documented OA and DJD,

steroidal intra articular injections, and knee arthroplasty is not a current treatment option." (Tr. 320-21).

In April, May, June, July, and August 2017, Plaintiff had appointments with providers at the Pain Consultants of West Florida. (Tr. 611, 606, 600, 595, 590). He reported between forty and seventy percent coverage of pain with medication and rated his pain level a six to nine out of ten. (Tr. 526, 532, 590, 606, 611). He exhibited decreased range of motion and tenderness in the lumbar spine and right knee. (Tr. 528, 534, 592, 608, 612). Plaintiff's gait was normal, however, and he exhibited normal motor strength in the hip. (Tr. 527, 534, 592, 608, 612-13). Plaintiff reported that he had fallen four times in one month due to his left knee "buckling/giving way." (Tr. 532). Pavel Kasianov, an advanced registered nurse practitioner, noted that Plaintiff's functional limitations included climbing stairs and walking normally. (Tr. 532). Additionally, ARNP Kasianov noted that Plaintiff's "pain is aggravated by prolonged standing, walking, squatting, kneeling, climbing and stairs," but the pain is relieved by bed rest and changes in position. (Tr. 532). Again, the providers recommended that Plaintiff exercise including abdominal strengthening, walking, core strengthening, and McKenzie exercises. (Tr. 535, 529, 593).

On September 14, 2017, Plaintiff had an appointment with PA Brinson at the Pain Consultants of West Florida. (Tr. 585). Plaintiff reported that his pain was eight and one half out of ten, but that he received fifty percent coverage of his pain. (Tr.

585). PA Brinson stated that Plaintiff's functional limitations included "general activity, walking ability, sleep, difficulty falling asleep, difficulty staying asleep, unable to get back to sleep after waking up, driving, walking, bathing, sweeping, vacuuming, leisure activities, bending over, climbing stairs, and walk[ing] normally." (Tr. 585). PA Brinson also recorded that Plaintiff's pain was "aggravated by bending, twisting, lifting, sitting, prolonged sitting, standing, prolonged standing, walking and any movement" but his pain was relieved by "change in position, medication, heat and ice." (Tr. 585). PA Brinson recommended that Plaintiff perform abdominal strengthening exercises, stretching, walking, core strengthening, and McKenzie exercises. (Tr. 588).

In October 2017, Dr. May noted that Plaintiff's back seemed stable on his present medication, but that Plaintiff sometimes experiences muscle spasms. (Tr. 552).

Between October and December 2017, Plaintiff regularly received pain management from providers at the Pain Consultants of West Florida. (Tr. 571, 574, 577). He reported sixty percent pain relief with medication. (Tr. 571, 574, 577). He rated his pain between seven and ten out of ten. (Tr. 571, 574, 577). He exhibited normal gait but also pain with decreased range of motion in his knee and lumbar area. (Tr. 572, 575, 579).

Plaintiff exhibited 5/5 muscle strength in lower extremities and 5/5 muscle strength in all major muscle groups. (Tr. 572, 575, 579). In October, PA Brinson noted that Plaintiff had balance problems (falling) and radicular bilateral leg pain. (Tr. 571). Plaintiff stated that "the pain limits his ability to sit comfortably, stand up straight bend over, do housekeeping, go shopping, and enjoy daily activities." (Tr. 571). Plaintiff also noted some pain relief with medications, lying down, and icy hot. (Tr. 571). In December, medical records reflect that Plaintiff used a cane to assist him with walking. (Tr. 579).

At his January, February, and March 2018 appointments with PA Brinson, Plaintiff continued to report sixty percent "improvement from medication." (Tr. 638, 643, 647). Plaintiff reported that the pain worsened when sitting, standing, walking, bending, housekeeping, and when performing twisting movements, but that he received pain relief from medication, ice, lying down, and stretching. (Tr. 643, 647). Plaintiff walked with a cane, and his lumbar range of motion was decreased. (Tr. 640, 645, 649). However, Plaintiff's lower extremity strength was 5/5. (Tr. 640, 645, 649). In March, PA Brinson's physical exam noted that Plaintiff seemed to be in "mild pain." (Tr. 649).

In April 2018, Plaintiff again reported sixty percent improvement with medication. (Tr. 673). PA Brinson again noted that Plaintiff appeared to be in "mild pain" and he had 5/5 muscle strength in his upper and lower extremities. (Tr. 675).

Plaintiff's gait was stooped, and he utilized a cane. (Tr. 675). PA Brinson described Plaintiff's condition as stable. (Tr. 676).

On May 15, 2018, Dr. Concepcion performed a caudal injection. (Tr. 679). Dr. Concepcion noted that Plaintiff had failed appropriate conservative care. (Tr. 681). At his follow-up appointment on June 14, 2018, Plaintiff reported "60% relief from last procedure for sustained at 50%." (Tr. 684). Plaintiff reported that his pain worsened when he was standing, walking, bending, lifting, squatting, and kneeling, but that lying down relieved the pain. (Tr. 684). Plaintiff stated that "the amount of pain relief he is now obtaining from current pain reliever(s) is enough to make a real difference in his life." (Tr. 684).

On July 13, 2018, Plaintiff stated that his pain level on average during the past week was a five and that pain relief he received made "a real difference in his life." (Tr. 690). Plaintiff reported that sitting, standing, walking, bending, and lifting worsened his pain, but that the medications, ice, heat, and hot soaks relieved some of the pain. (Tr. 690). PA Brinson recorded that physical therapy did not provide relief and that Plaintiff's pain was at an eight out of ten but on a daily basis the pain was ten out of ten with increased activity. (Tr. 690). Plaintiff also stated that his activities of daily living, including physical functioning, family relationships, social relationships, mood, sleep, and overall functioning were better since the last assessment. (Tr. 690).

At the August through December 2018 pain management visits, Plaintiff continued to report back pain and relief with medication. (Tr. 696-723). In August, Plaintiff said that his pain medication kept him comfortable. (Tr. 696). In October, PA Brinson said he was stable from a pain standpoint and deferred injections. (Tr. 711). In December, Plaintiff stated that his pain had been relieved eighty-five percent in the past week and that "the amount of pain relief he is now obtaining from current pain reliever(s) is enough to make a real difference in his life." (Tr. 702).

## B.    <u>Consultative Exam</u>

On September 7, 2017, Plaintiff underwent a consultative exam with Dr. Alexys Hillman, D.O. (Tr. 539-48). Dr. Hillman observed that Plaintiff could perform all manipulation tasks. (Tr. 542). He also noted that Plaintiff was in pain but was cooperative. (Tr. 542). Plaintiff's posture, gait, station, speed, sustainability and stability were normal, and he was able to get on and off the table normally without assistance. (Tr. 545). He exhibited no ataxia, antalgia, circumduction, lurching, or unsteadiness. (Tr. 545). Plaintiff used a straight metal cane but was able to ambulate approximately six feet without the cane. (Tr. 545). Plaintiff was not able to heel walk or bend at the waist, but was able to walk on toes, tandem walk, and squat. (Tr. 545). Plaintiff's straight leg raises were normal, and he exhibited normal muscle strength, intact reflexes, and normal sensation. (Tr. 545-546).

C.    **Summary of the Hearing Testimony**

On May 19, 2017, Plaintiff—represented by counsel—appeared and testified at a hearing before the ALJ. (Tr. 39-64). Plaintiff testified that he drove to the hearing. (Tr. 48). He stated that his pain medication makes him drowsy, so he did not take the medication before the hearing. (Tr. 48). Plaintiff had his cane with him at the hearing but said that there were days that he did not use his cane. (Tr. 48-49). Plaintiff testified that he drove his son to school three days per week, and the drive took 20 minutes. (Tr. 49). He also picked up his son from school. (Tr. 49-50). He did not take his medication before driving his son to school or picking him up. (Tr. 49-50). Plaintiff stated that as soon as he returned home from his son's school, he would take his pain medication and lie down on the couch. (Tr. 50).

 Plaintiff testified that he tries to clean his home during the day. (Tr. 50). Plaintiff also testified that he cooked small meals, like chicken nuggets or hot dogs. (Tr. 51). Plaintiff stated that he no longer shops for groceries because of his back spasms. (Tr. 52). Plaintiff noted that he was unable to stand in a 30-minute line because he would probably "drop[] down." (Tr. 52). When the ALJ asked, "What do you think would prevent you from being able at a job—do a job where you were seated most of the time like in an office setting . . . ?" Plaintiff responded that "it's the pain because right now, I'm so uncomfortable. I prefer to lay down on the floor but it's just that pain kind of sit down, you know, for a long period of time, I wouldn't

be able to do it." (Tr. 52-53). Plaintiff testified that approximately four to five days per week he has pain that is "more intense." (Tr. 55). Plaintiff testified that at times, he may try to get his older daughter or wife to pick up Plaintiff's son when the pain is intense. (Tr. 55-56).

## V. DISCUSSION

Plaintiff contends that the ALJ erred in his evaluation of Plaintiff's subjective complaints. Specifically, Plaintiff argues that the ALJ failed to provide explicit and adequate bases for discrediting Plaintiff's testimony. (Doc. 19 at 15-24). However, there is substantial evidence in the record to support the ALJ's findings that Plaintiff's subjective complaints were not entirely consistent with the record evidence.

## A.     The ALJ Properly Applied the Three-Part Pain Standard

The Eleventh Circuit has established a three-part standard for evaluating a plaintiff's testimony regarding subjective symptoms. *Foote*, 67 F.3d at 1560; *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). A plaintiff "must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002); *Foote*, 67 F.3d at 1560; *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir.

1986); *see* 20 C.F.R. § 404.1529(a) (informing claimants that "statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged").

If the record shows that the plaintiff has a medically-determinable impairment that could reasonably be expected to produce his symptoms, the ALJ then must "evaluate the intensity and persistence" of the plaintiff's symptoms to determine how the symptoms limit the plaintiff's capacity to work. 20 C.F.R. § 404.1529(c)(1); *Strickland*, 516 F. App'x at 831. "In doing so, the ALJ considers all of the record, including the objective medical evidence, the claimant's history, and statements of the claimant and her doctors." *Strickland*, 516 F. App'x at 831 (citing 20 C.F.R § 404.1529(c)(1)-(2)).

The ALJ also must consider the following factors: (1) the plaintiff's daily activities; (2) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms; (3) any precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of the plaintiff's medication; (5) any treatment other than medication the plaintiff received for pain relief; (6) any measures the plaintiff used to relieve his pain or symptoms; and (7) other factors concerning the

plaintiff's functional limitations and restrictions due to his pain or symptoms. 20 C.F.R § 404.1529(c)(3); *Strickland*, 516 F. App'x at 831-32.

Finally, the ALJ should examine the plaintiff's statements regarding his symptoms in relation to all the evidence and "consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the plaintiff's] statements and the rest of the evidence." 20 C.F.R § 404.1529(c)(4); *Strickland*, 516 F. App'x at 832; *Jarrell v. Comm'r of Soc. Sec.*, 433 F. App'x 812, 814 (11th Cir. 2011) (The ALJ must consider "all evidence, including subjective statements about the intensity, persistence, and functionally limiting effects of pain [as well as] the objective medical evidence, laboratory findings and statements from treating or nontreating sources about how the symptoms affect the claimant.").

Here, the ALJ properly applied that pain standard. In the first step, the ALJ determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms." (Tr. 20). In the second part of the analysis, however, the ALJ determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other record evidence in the record." (Tr. 20).

To the extent that Plaintiff insinuates that the ALJ should have terminated his inquiry after he found that Plaintiff's conditions could have caused Plaintiff's symptoms, this is plainly incorrect. As discussed above, the ALJ must "evaluate the intensity and persistence" of the plaintiff's symptoms so that the ALJ can determine how the symptoms limit the plaintiff's capacity for work. 20 C.F.R. § 404.1529(c)(1); *Foote*, 67 F.3d. at 1561 (explaining that an ALJ must consider evidence about the intensity, persistence, and functionally limiting effects of pain or other symptoms after a claimant establishes a medical impairment that could reasonably be expected to produce pain); *Strickland*, 516 F. App'x at 831 ("If the record shows that the claimant has a medically-determinable impairment that could reasonably be expected to produce her symptoms, the ALJ must evaluate the intensity and persistence of the symptoms in determining how they limit the claimant's capacity for work."); *see Wilson*, 284 F.3d at 1225.

The ALJ properly applied the three-part standard for evaluating Plaintiff's testimony regarding subjective symptoms. Furthermore, as discussed below, the ALJ articulated explicit and adequate reasons for determining that Plaintiff's subjective complaints were not entirely consistent with the record evidence, and substantial evidence supports the ALJ's reasoning.

**B.**    **The ALJ Articulated his Reasons for Finding Plaintiff's Subjective Complaints Not Entirely Consistent with the Record Evidence and Substantial Evidence Supports the ALJ's Reasoning**

When an ALJ discredits subjective testimony, "he must articulate explicit and adequate reasons for doing so." *Wilson*, 284 F.3d at 1225 (citations omitted); *Foote*, 67 F.3d at 1562 ("If proof of disability is based upon subjective evidence and a credibility determination is, therefore, crucial to the decision, the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding.") (citation and quotation marks omitted). The ALJ's articulated reasons must be supported by substantial evidence. *Jones v. Dep't of Health & Human Servs.*, 941 F.2d 1529, 1532 (11th Cir.1991); *Foote*, 67 F.3d at 1562 ("A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court.").

"While the ALJ does not have to cite to particular phrases or formulations, broad findings that a claimant was incredible and could work are, alone, insufficient" for the court to conclude that the ALJ considered the plaintiff's medical condition as a whole. *Strickland*, 516 F. App'x at 832 (citing *Foote*, 67 F.3d at 1562). "Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true." *Wilson*, 284 F.3d at 1225.

"A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Jarrell*, 433 F. App'x at

814 (quoting *Foote*, 67 F.3d at 1562); *see also Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005) ("We recognize that credibility determinations are the province of the ALJ").

### 1.    *Substantial Evidence Supports the ALJ's Determination that Plaintiff's Statements Regarding his Daily Living Activities Undermined His Allegations*

Plaintiff argues that the ALJ mischaracterized the evidence regarding Plaintiff's childcare capabilities as it relates to his daily living activities. (Doc. 19 at 18-19). Plaintiff argues that the ALJ incorrectly stated that "there is no evidence Mr. Purifoy has ever been unable to drop off or pick up his young son." (*Id.* at 19).

As discussed above, the Eleventh Circuit has acknowledged the relevance of daily activities in disability cases. *See Macia v. Bowen*, 829 F.2d 1009, 1012 (11th Cir. 1987) (holding that an ALJ may consider daily activities in assessing a claimant's credibility); *see also* 20 C.F.R. § 404.1529(c)(3)(i) (specifically listing "daily activities" as one of the factors to consider in evaluating a claimant's credibility).

Here, Plaintiff takes the ALJ's statement out of context. The ALJ stated that Plaintiff "provides childcare several days of the week" and "[d]espite his impairments, he appears to be a reliable child-care provider so long as he takes appropriate precautions. There is no indication that he has ever failed to do so." (Tr. 20). These statements are supported by substantial evidence. Plaintiff stated on June

21, 2017, that he "typically spends the day at home with his five year [old] son." (Tr. 194). Additionally, Plaintiff stated at his hearing that he was able to take his son to school and pick him up three days per week and that, in order to do so, he did not take his medication. (Tr. 49-50). The fact that Plaintiff testified that in the past, he has tried to get his older daughter or wife to pick up his son from school does not negate that, by and large, Plaintiff was a reliable child-care provider who took his son to school and picked him up from school three times a week. (Tr. 55-60) (Plaintiff testified that if he has a period of more intense pain, he will "try to get" his older daughter or wife to pick up his son). Ultimately, Plaintiff's own testimony was the substantial evidence that supports the ALJ's statements.

## 2. *Substantial Evidence Supports the ALJ's Determination Regarding Plaintiff's Ability to Exercise*

Plaintiff argues that the ALJ erred by asserting "that the vague reference from [Plaintiff's] doctors that some exercise could improve his symptoms discredit his testimony about the pain he experiences." (Doc. 19 at 20). According to Plaintiff, the ALJ focused "very precisely on the recommendation of Dr. Concepcion at an office visit on May 15, 2018, at which time Dr. Concepcion had performed an epidural caudal injection, that Mr. Purifoy might try Yoga to reduce his pain symptoms as evidence to discredit Mr. Purifoy's testimony regarding the pain he experiences." (Doc. 19 at 20). Plaintiff argues that there is no evidence that Plaintiff performed any Yoga or engaged in vigorous exercises. (*Id.*).

The ALJ did not state that Plaintiff engaged in regular exercise, but rather that his doctors recommended exercise, suggesting that Plaintiff's physicians thought that Plaintiff was physically capable of said exercise. This statement is supported by substantial evidence. Plaintiff's medical records reflect that his physicians repeatedly recommended exercise. (Tr. 416, 411, 257, 381, 352, 358, 363, 368, 389, 394, 400, 406); *see Macfarlan v. Colvin*, No. 3:15-cv-605-J-JRK, 2016 WL 1622306, at *5-6 (M.D. Fla. Apr. 25, 2016) (determining that the ALJ's statement that plaintiff's doctors' recommendation to engage in a regular, low intensity exercise routine, suggested that Plaintiff was physically able to exercise regularly was supported by substantial evidence); *Broz v. Astrue*, No. 3:07-cv-204/RV/EMT, 2008 WL 1995084, at *15 (N.D. Fla. May 5, 2008) ("[T]he record suggests that Plaintiff's obesity did *not* impose any additional restrictions, as his physician—fully aware of Plaintiff's obesity—believed that Plaintiff was capable of physical exercise, which is consistent with a finding that Plaintiff was capable of performing light work.").

Additionally, the record reflects that Plaintiff did at least some home exercises. (Tr. 381) ("Patient has been doing physician guided regular home exercises almost [o]n a daily basis for more than three months he stated and pain still persist."); (Tr. 345) ("The pain is relieved by exercise, medication, heat and opioid analgesics."); (Tr. 626) ("The pain is relieved by exercise, medication, heat and

opioid analgesics."). Substantial evidence supports the ALJ's determination on this point.

### 3.    *Substantial Evidence Supports the ALJ's Statement that the Record Does Not Reflect Plaintiff's Consistent Use of a Cane*

Plaintiff argues that the ALJ "consistently asserts that the medical evidence does not reflect that Mr. Purifoy does not require the use of a cane, which, the ALJ avers, indicates his conditions are not producing the pain he describes." (Doc. 19 at 21). Plaintiff takes issue with one of the ALJ's footnotes, which states:

> The longitudinal medical evidence of record does not reflect a consistent use of a medical assistive device and it is unclear why the claimant required a cane during his hearing to ambulate save his not taking his medication. He says he needs it some days and not others. He has not been prescribed a cane nor has any source deemed it necessary. No source has mentioned or recommended that he use a cane if not taking his medication.

(Tr. 20). Plaintiff argues that although "the cane may never have been prescribed, no provider has told Mr. Purifoy not to use it." (Doc. 19 at 22).

The record contains substantial evidence to support the ALJ's statements regarding Plaintiff's inconsistent use of a cane. (Tr. 20). At the hearing, Plaintiff testified that some days he does not use his cane. (Tr. 48-49). Furthermore, on July 28, 2017, Plaintiff stated that "he only uses a cane when he goes outside his home, but is able to ambulate without the cane while he is home." (Tr. 216). On September 7, 2017, Plaintiff was able to ambulate approximately six feet without his cane. (Tr. 545). Additionally, from the record, it appears that Plaintiff began utilizing a cane

on or about December 2017. (Tr. 579). During the visits prior to December 2017,
Plaintiff's providers observed normal gait and did not mention that Plaintiff used or
needed a cane.

The ALJ merely suggested—based on Plaintiff's ability to ambulate without
the assistance of a cane—that Plaintiff may be exaggerating the extent of his pain.
(Tr. 20). As discussed above, this is supported by substantial evidence.

### 4. *Substantial Evidence Supports the ALJ's Determination that the Conservative Nature of Plaintiff's Treatment Undermined Plaintiff's Subjective Allegations*

The ALJ explained throughout his findings that Plaintiff's allegations of
disabling symptoms were inconsistent with the conservative nature of the care he
received for his back pain. (Tr. 20-21). Plaintiff, however, argues that when the ALJ
discussed the conservative nature of Plaintiff's care, "he ignore[d] the direct and
explicit statements in the medical records related to Mr. Purifoy's physical
limitations." (Doc. 19 at 24).

The type of treatment a plaintiff receives is relevant to an ALJ's evaluation of
that plaintiff's subjective complaints. *See* 20 C.F.R. § 404.1529(c)(3) (stating that
an ALJ will carefully consider "the information that your medical sources provide
about you pain" including "treatments or other methods you use to alleviate them");
20 C.F.R. 404.1529(c)(3)(v) (stating that an ALJ will consider "treatment, other than
medication, you receive or have received for relief of your pain or other

symptoms."); *Wolfe v. Chater*, 86 F.3d 1072, 1078 (11th Cir. 1996) (stating that an ALJ may properly consider a plaintiff's course of conservative treatment as evidence that contradicts the plaintiff's subjective complaints).

Additionally, the ALJ did not "ignore" the "statements in the medical records related to Mr. Purifoy's physical limitations." Rather, the ALJ stated that Plaintiff's pain was treated primarily through medication instead of "repeated back surgeries, physical therapy, hospital visits, prescribed assistive devices, or other extraordinary intervention." (Tr. 20). Notably, the "type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or has taken to alleviate" pain is another factor an ALJ must consider. 20 C.F.R. § 404.1529(c)(3)(iv). As the ALJ discussed, Plaintiff routinely reported that medication decreased the severity of his pain. (Tr. 20, 339, 345, 350, 355, 360, 365, 376, 386, 391, 397, 403, 526, 532, 571, 574, 577, 590, 606, 611, 620, 626, 638, 643, 647). Indeed, in March and April 2018, PA Brinson believed that Plaintiff experienced only "mild pain" (Tr. 649, 675), in April 2018, PA Brinson described Plaintiff's condition as "stable" (Tr. 676), and in May and December 2018, Plaintiff stated that "the amount of pain relief he is now obtaining from current pain reliever(s) is enough to make a real difference in his life." (Tr. 684, 702). Finally, in July 2018, Plaintiff stated that his activities of daily living, including physical functioning, family relationships, social relationships, mood, sleep, and overall functioning were better since the last assessment. (Tr. 690).

Thus, there is substantial evidence to support the ALJ's determination that the conservative nature of Plaintiff's treatment undermined Plaintiff's subjective allegations.

## VI.    CONCLUSION

For the reasons set forth above, the undersigned respectfully **RECOMMENDS** that:

1.    The decision of the Commissioner be **AFFIRMED**, and this action be **DISMISSED**.

2.    **JUDGMENT** be entered, pursuant to sentence four of 42 U.S.C. § 405(g), **AFFIRMING** the decision of the Commissioner.

3.    The clerk of the court be directed to close the case file.

At Pensacola, Florida this 27th day of July, 2021.

/s/ *Michael J. Frank*
**Michael J. Frank**
**United States Magistrate Judge**

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days of the date of the report and recommendation. Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control. An objecting party must serve a copy of the objections on all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the**

**district court's order based on unobjected-to factual and legal conclusions.** *See* **11th Cir. Rule 3-1; 28 U.S.C. § 636.**